UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

EMILIA GALLO,

        Plaintiff,

    v.

KILOLO KIJAKAZI, acting
Commissioner of Social Security,

        Defendant.

No. 1:22-cv-00152-GSA

**OPINION & ORDER DIRECTING ENTRY
OF JUDGMENT IN FAVOR OF
PLAINTIFF AND AGAINST DEFENDANT
COMMISSIONER OF SOCIAL SECURITY**

**(Doc. 15, 16)**

## I.    Introduction

Plaintiff Emilia Gallo ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act. The matter is before the Court on the parties' briefs which were submitted without oral argument to the United States Magistrate Judge.[1] Docs. 15–17. After reviewing the record the Court finds that substantial evidence and applicable law do not support the ALJ's decision.

## II.    Factual and Procedural Background[2]

On October 24, 2019 Plaintiff applied for disability insurance benefits alleging disability as of November 9, 2018. The application was denied initially on March 18, 2020 and on reconsideration on May 18, 2020. AR 102, 118. Two administrative hearings were held before an Administrative Law Judge (the "ALJ"), on February 9, 2021 and August 30, 2021, respectively. AR 39–60; 61–89. On September 30, 2021 the ALJ issued an unfavorable decision. AR 12–38. The Appeals Council denied review on December 28, 2021. AR 1–6. On February 4, 2022, Plaintiff filed a complaint in this Court.

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge. *See* Docs. 7 and 12.

[2] The Court has reviewed the relevant portions of the administrative record including the medical, opinion and testimonial evidence about which the parties are well informed, which will not be exhaustively summarized. Relevant portions will be referenced in the course of the analysis below when relevant to the parties' arguments.

### III.   The Disability Standard

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.   "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).   Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.   *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).   It is more than a scintilla, but less than a preponderance.   *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).

When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and quotations omitted).   If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).   "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate non-disability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.   42 U.S.C. § 1382c(a)(3)(A).   An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 416.920(a)-(f).   The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the

claimant is or is not disabled.  20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. § 416.920(a)-(f).  While the Plaintiff  bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education and work experience.  *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

## IV.    The ALJ's Decision

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged disability onset date of November 9, 2018.  AR 18.  At step two the ALJ found that Plaintiff had the following severe impairments: fibromyalgia; status post bilateral carpal tunnel release; cervical spondylosis; and, lumbar degenerative joint disease.  AR 18.  The ALJ also found at step two that Plaintiff had the following non-severe impairments: COPD; obstructive sleep apnea; gastroesophageal reflux disease (GERD); hyperlipidemia (high cholesterol); prediabetes/diabetes; hypothyroidism; hypertension; vitamin D deficiency; and anxiety disorder. AR 18–19.  At step three the ALJ found that Plaintiff did not have an impairment, or combination thereof, that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 21–22.

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) with the following restrictions: occasionally climb ramps and ladders but otherwise never climb; occasionally perform postural activities; frequently perform handling and fingering.  AR 22–29.

At step four, the ALJ found that Plaintiff could perform her past relevant work as a case aid as generally performed, but not as actually performed.  AR 25.  Accordingly, the ALJ found that

Plaintiff was not disabled at any time since her alleged onset date of November 9, 2018.  AR 30.

## V.   **Issues Presented**

Plaintiff asserts two claims of error: 1) the ALJ failed to provide specific, clear, and convincing reasons for discounting Plaintiff's allegations of pain and physical dysfunction; 2) the ALJ disregarded material vocational evidence contradicting her determination that Plaintiff was capable of performing her past relevant work.  Br. at 5, Doc. 15.

### A.   **Plaintiff's Allegations of Pain and Physical Dysfunction**

#### 1.   **Applicable Law**

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity.  *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018).  The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence."  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC must consider all of the claimant's impairments, including those that are not severe.  20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

A determination of residual functional capacity is not a medical opinion, but a legal decision that is expressly reserved for the Commissioner.  *See* 20 C.F.R. §§ 404.1527(d)(2) (RFC is not a medical opinion), 404.1546(c) (identifying the ALJ as responsible for determining RFC).  "[I]t is the responsibility of the ALJ, not the claimant's physician, to determine residual functional capacity."  *Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).  In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995).

"In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment."  *Robbins,* 466 F.3d at 883.  *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical

and other evidence).  "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (quoting *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986)).  The RFC need not mirror a particular opinion; it is an assessment formulated by the ALJ based on all relevant evidence.  *See* 20 C.F.R. §§ 404.1545(a)(3).

The ALJ is responsible for determining credibility,[3] resolving conflicts in medical testimony and resolving ambiguities.  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995).  A claimant's statements of pain or other symptoms are not conclusive evidence of a physical or mental impairment or disability.  42 U.S.C. § 423(d)(5)(A); Soc. Sec. Rul. 16-3p.   An ALJ performs a two-step analysis to determine whether a claimant's testimony regarding subjective pain or symptoms is credible.  *See Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014); *Smolen*, 80 F.3d at 1281; S.S.R 16-3p at 3.  First, the claimant must produce objective medical evidence of an impairment that could reasonably be expected to produce some degree of the symptom or pain alleged.  *Garrison*, 759 F.3d at 1014; *Smolen*, 80 F.3d at 1281–82.  If the claimant satisfies the first step and there is no evidence of malingering, the ALJ must "evaluate the intensity and persistence of [the claimant's] symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities."  S.S.R. 16-3p at 2.

An ALJ's evaluation of a claimant's testimony must be supported by specific, clear and convincing reasons.  *Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014); *see also* S.S.R. 16-3p at *10.  Subjective testimony "cannot be rejected on the sole ground that it is not fully corroborated by objective medical evidence," but the medical evidence "is still a relevant factor in determining

---

[3] Social Security Ruling 16-3p applies to disability applications heard by the agency on or after March 28, 2016.  Ruling 16-3p eliminated the use of the term "credibility" to emphasize that subjective symptom evaluation is not "an examination of an individual's character" but an endeavor to "determine how symptoms limit ability to perform work-related activities."  S.S.R. 16-3p at 1-2.

the severity of claimant's pain and its disabling effects." *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); S.S.R. 16-3p (citing 20 C.F.R. § 404.1529(c)(2)).

The ALJ must examine the record as a whole, including objective medical evidence; the claimant's representations of the intensity, persistence and limiting effects of his symptoms; statements and other information from medical providers and other third parties; and any other relevant evidence included in the individual's administrative record.  S.S.R. 16-3p at 5.

## 2.   Analysis

The ALJ found there were medically determinable impairments which could reasonably be expected to cause the alleged symptoms.  AR 23.  The ALJ found no malingering.  AR 23.  As such, the ALJ was required to identify clear and convincing reasons for rejecting Plaintiff's symptom allegations.

Plaintiff underscores the following statements from her hearing testimony and function report: 1) she could not work due to excruciating pain throughout her whole body arising from fibromyalgia and osteoarthritis (AR 67); 2) she could only sit for 30 minutes before needing to change positions (AR 71); 3) she could be on her feet for 30 to 40 minutes at the longest (AR 72); 4) during an 8-hour span she spent 5 hours laying down (AR 72); 5) she was only able to lift and carry 5 to 7 pounds; 6) she could use her hands for 30 minutes before needing to rest them (AR 73); 7) she experienced fatigue and shortness of breath when walking or doing a lot of talking (AR 77–78); 8)  she had problems with reaching forward, and she would be able to do so less than one-third of a workday (AR 45); and,  9) she spent 2 to 3 days per week battling migraines for which she took Norco pain medication (AR 49-50).  Br. at 6.

As to her fatigue and shortness of breath with activity, the testimony does not speak to a specific functional limitation nor to the intensity, persistence, and limiting effects of symptoms. The RFC is not a representation of the most one can do while remaining pain free, it is "the most

you can do despite your limitations."  20 C.F.R. 416.945(a)(1).  The remaining testimony Plaintiff emphasizes does speak to specific functional limitations, including sitting and standing capacity, lifting and carrying capacity, hand usage and reaching, none of which were incorporated into the RFC.  As such, if the ALJ erroneously rejected these statements, the error would be harmful.

First, Plaintiff challenges the ALJ's reliance on her activities of daily living as a basis for discrediting her testimony.  The ALJ noted that Plaintiff reported she was able to prepare at least simple meals, do household chores, drive, and do yoga exercises twice a week.  AR 23, 70.  Additionally, Plaintiff reported doing some rock painting and other crafts when not in severe pain.  AR 70; 364.

Plaintiff emphasizes additional detail and contextual information overlooked by the ALJ including: her meal preparation was limited to frozen foods and sandwiches save for cooking a meal once a week (AR 362); she reported doing some household chores such as dusting, washing dishes and cleaning, but these chores could take her more than a day and she would take a week off from chores after a symptom flare up (AR 362); she shopped only once per week when not in pain (AR 363).  On balance, Plaintiff contends these activities establish little more than the fact that she is not 100% incapacitated, but they are not necessarily transferable to a work setting and, even if they were transferrable, the evidence does not establish she could do these activities on a consistent full time basis.

The point is reasonable insofar as the ALJ neglected to set forth all relevant contextual information identified orally and in Plaintiff's function report as to the nature and extent of Plaintiff's activities.  She was able to take breaks, go at her own pace, and discontinue for extended periods when her symptoms flared, accommodations which would not be available in a competitive work environment.  On balance however, the ALJ's reliance on the activities was not unreasonable.

1
2
3
4
5
6
7
8

As to Plaintiff's contention that the evidence fails to establish she could perform those activities on a consistent full time basis, the contention is not quite on all fours with the governing standard as stated by the Ninth Circuit in *Orn*.  An ALJ can rely on a claimant's daily activities as a basis for discrediting a claimant's testimony if: (1) the daily activities contradict the claimant's other testimony; or (2) "a claimant is able to spend a substantial part of [her] day engaged in pursuits involving the performance of physical functions that are transferable to a work setting."  *Orn v. Astrue*, 495 F.3d 625, 639 (9th Cir. 2007).

9
10
11
12
13
14
15
16
17
18

As to the second basis identified in *Orn*, the above-cited statements Plaintiff made orally and in her function report were not entirely clear as to the duration and frequency of Plaintiff's activities.  She did testify that in any given 8-hour period she spends 5 of 8 hours in bed, which suggests she is not spending a substantial part of her day on any of the cited activities or combination thereof.  However, she also testified that she told her physician how long she spends in bed and her physician suggested she get up and move around more (AR 73) which undermines the notion that spending 5 of 8 daytime hours in bed is an unavoidable or beneficial component of her symptom management.

19
20
21
22
23
24
25
26
27

As to the first basis identified in *Orn* ("the daily activities contradict the claimant's other testimony"), some precedent suggests the contradiction must be fairly direct, and the ALJ must engage in a matching exercise and explain "which daily activities conflicted with which part of Claimant's testimony."  *Burrell v. Colvin*, 775 F.3d 1133, 1138 (9th Cir. 2014).  Other precedent suggests the contradiction need not be as direct and no matching exercise is required.  *See Valentine v. Commissioner Social Sec. Admin.*, 574 F.3d 685, 693 (9th Cir. 2009) (finding the ALJ satisfied the "clear and convincing" standard for an adverse credibility determination where claimant engaged in "gardening and community activities . . .  evidence [which] did not suggest Valentine

28

8

could return to his old job," but "did suggest that Valentine's later claims about the severity of his limitations were exaggerated.").

Here, again, Plaintiff's activities included at a minimum: simple meal preparation of sandwiches and frozen foods; once weekly cooking; household chores; driving; twice weekly yoga sessions; occasional rock painting and other crafts.  Although these activities do not suggest she could return to her former job as a case aid, the activities tend to undermine her testimony as to disabling pain and physical dysfunction precluding her from lifting more than 5 to 7 pounds, or from sitting, standing, walking, and using her hands for more than 30 minutes.  *See Valentine*, 574 F.3d at 693.

Plaintiff also disputes the sufficiency of the ALJ's conclusion regarding the objective medical record.  First, the ALJ described the results of the February 2020 consultative examination in detail, including: various tender points; pain with lumbar flexion and extension; negative straight leg raise; no muscle spasms; neurologically intact; good tone bilaterally with good active motion; 5/5 strength in all muscle groups tested; intact sensation; normal reflexes; good coordination of fine motor movements in her hands; walked with a right sided limp but no assistive device; and,  could not heel or toe walk.  AR 24 (citing AR 499–503).

The ALJ then characterized the remainder of the examinations in the record as "generally in line with the physical consultative examination findings."  *Id.*  Specifically, the ALJ noted Plaintiff at times presented with deficits including: she often presented with diffuse tender points consistent with fibromyalgia; various other tender points consistent with her other musculoskeletal conditions; and antalgic gait at times.  *Id.*  Conversely, the ALJ noted that the record also reflected: many findings of normal gait; many findings of normal strength with few findings of reduced strength (especially in her non-physical therapy examinations "which were performed by more qualified medical professionals than her physical therapy examinations"); mostly no significant

edema in the extremities;  no significant muscle atrophy to suggest long term disuse of a muscle; no significant long term use of an assistive device to ambulate; post-surgery carpal tunnel symptoms treated with medication and wrist splints; negative tinel's test during an examination in January 2020; generally good strength and range of the right shoulder likely due to benefiting from her prior shoulder surgery.  *Id.*  (citing Exhibit(s) 3F/11/16, 17F/4, 18F/22, 21F/12-14, 22F/36/48, 23F, 28F/4-8, 30F/5, 34F).

A few deficiencies and idiosyncrasies are apparent in the ALJ's discussion as follows: 1- the ALJ acknowledged a mix of normal and abnormal muscle strength findings, but seemingly minimized the latter by noting the abnormal findings were identified by physical therapists who are less qualified medical professionals.  The point is not persuasive.  As between doctors and physical therapists, doctors are perhaps more qualified in a general sense.  However, it is debatable that doctors are more qualified to assess muscle strength, and it is unlikely that general internists and non-orthopedic specialists (such as Plaintiff's cardiologist and endocrinologist, discussed below) perform that task as thoroughly or compressively as physical a therapist; 2- as to the ALJ's assertion that the normal muscle strength findings were many and the abnormal findings were few, a generalization like that would be better supported by exemplary pin citations to each category of findings.  The same criticism applies to the lengthy paragraph paraphrased above in which the ALJ made a variety of generalizations about the objective medical record as a whole, supported by a long string citation at the conclusion of the paragraph with no indication as to which assertion each citation applies to.  Nevertheless, upon review the cited exhibits are generally in line with the ALJ's characterization with some exceptions noted below.

*First*, the ALJ cited exhibit 3F at page 11 (AR 447), an April 8, 2019 examination which noted: symmetrical joint alignment; diffuse osteoarthritis and joint pain; diffuse tenderness; no signs of muscle atrophy; no edema; mildly restricted range of motion in major joints; muscle

strength 5/5 in all major muscle groups except for hand flexors and extensors; positive tinel's and phalen's sign for carpal tunnel syndrome.  AR 447.  The ALJ discussed the negative findings from this examination but overlooked the positive tinel's and phalen's carpal tunnel provocation tests. Those positive tests were a counter example to the negative tests cited by the ALJ dated January 2020, a counter example which also post-dated her carpal tunnel release procedures in early 2018 and support the existence of continued dysfunction after surgery.  In the remaining respects the examination aligns with the ALJ's description.  The ALJ cited page 16 of the same exhibit (AR 452) which was a June 17, 2019 examination noting similar findings.

_Second_, the ALJ cited Exhibit 17F at 4 (AR 620), a podiatrist visit resulting in a diagnosis of neuropathy and plantar fasciitis.  It does not appear to relate to any of the findings the ALJ made in the paragraph paraphrased above and, in any event, does not appear to relate to any of the issues at bar.

_Third_, the ALJ cited Exhibit 18F at page 22 (AR 644), an April 29, 2020 encounter noting cervical spine tenderness and reduced range of motion, significant axial pain, as well as 5/10 grip strength bilaterally and a corresponding diagnosis of carpal tunnel syndrome.  The significant description of the axial pain was not entirely consistent with the ALJ's characterization of diffuse tenderness.   Further, the reduced grip strength finding was not in keeping with the ALJ's generalization that strength deficits were mostly in the physical therapy context (as this was not a PT visit), and thus another finding suggestive of continued deficiencies post carpal tunnel release surgery-- though the ALJ did not make that specific connection.

_Fourth_, the ALJ cited exhibit 21F at pages 12 to 14 (AR 681–83), a physical therapy evaluation dated December 31, 2019 noting antalgic gate, range of motion deficits, and strength deficiencies as the ALJ noted.  Although the ALJ was not justified in minimizing those deficiencies

solely because they were documented in the physical therapy context, the strength ratings were still at least 4 minus or 4 plus out of 5.

*Fifth*, the ALJ cited Exhibit 22F at page 36 (AR 719) a June 25, 2020 examination which the ALJ ostensibly cited as illustrative of normal gait.  Notably, however, the exam was performed at Valley Heart Institute where Plaintiff presented "for further evaluation of chest discomfort as well as shortness of breath." AR 717.  Thus the context of the record explains the lack of relevant musculoskeletal examination findings and minimizes the importance of the notation of normal gait. The ALJ cited another visit at Valley Heart Institute which noted the same findings. Ex. 30F/5 (AR 899).  The same critique applies to the ALJ's citation of page 48 of the same exhibit which was a referral visit for hyperthyroidism.  AR 731.

These cardiology and endocrinology visits are not exemplary of any of the ALJ's generalizations about benign physical examinations. They are counterpoints to the ALJ's suggestion that physical therapists' examination results are not as compelling as those performed by doctors who are more qualified.  The qualifications of the medical professional are not as pertinent as the context of the visit.

*Sixth*, the ALJ cited Exhibit 23F in its entirety (AR 746–51), a January 14, 2020 follow up for recurrent bilateral carpal tunnel syndrome status post release surgeries and neck pain.  The exam reflects cervical paraspinal tenderness and limitated range of motion, as acknowledged by the ALJ. AR 747.  The exam also reflects normal muscle strength in upper and lower extremities, negative Tinel and Durkin's tests at the wrists, and no thenar atrophy.  *Id.*  In that respect this exam contrasted with findings from other exams cited above noting 5/10 grip strength bilaterally and positive Tinel's compression tests.

*Seventh*, the ALJ cited Exhibit 28F at pages 4 through 8 (AR 837–41), a May 24, 2021 internal medicine follow up for numbness in extremities, low back pain, chest pain/shortness of

breath, and memory loss.  Musculoskeletal and neurological examination were not detailed, noting symmetrical joint alignment, normal gait, and intact sensation.  AR 840.

*Finally*, the ALJ cited Exhibit 34F (AR 926), an April 19, 2021 follow up visit for chronic conditions.  No examination was performed as it was a telehealth consultation.  The ALJ likely included it in the string citation to support the finding that Plaintiff's carpal tunnel was managed with medication and wrist splints.

Although the ALJ's description of the objective examinations was not overwhelmingly persuasive, the record did document mixed findings as to gait, muscle strength (including grip strength), and carpal tunnel compression tests, as the ALJ noted.  The record further documented largely negative findings as to edema and atrophy.  The ALJ reasonably concluded these records were generally in line with the benign findings at the consultative examination.

Plaintiff contends the ALJ's focus on examination and diagnostic findings is not relevant as to her fibromyalgia because "The condition is diagnosed entirely on the basis of a patient's self-reports of pain and other symptoms, and there are no laboratory tests to confirm the diagnoses."  Br. at 9 (citing *Revels v. Berryhill*, 874 F.3d 648, 656 (9th Cir. 2017)).  Although that is true, it is also well established that "An individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability." *Fair*, 885 F.2d at 603; *see also* 20 C.F.R. § 404.1529(a) (an ALJ 'will consider' all of a claimant's statements about symptoms, but "statements about your pain or other symptoms will not alone establish that you are disabled").  The ALJ did not reject that Plaintiff had fibromyalgia as evidenced by tender points and hyperalgesia on physical examination, and the condition significantly limited one or more work functions.  The ALJ found it to be a severe impairment and assessed an RFC for light work with additional restrictions.  Plaintiff emphasizes additional manifestations of the condition such as sleep disturbances and fatigue, but does not tether them to any argument about what restrictions ought to have been included in the RFC given these.

Plaintiff emphasizes that her fibromyalgia pain was compounded by cervical and lumbar facet dysfunction, positive objective signs of decreased range of motion in her lumbar and cervical spine (AR 502-503), slowed or abnormal gait, tenderness over cervical facets, reduced grip strength, and advanced lumbar arthritis on MRI.  AR 481.  The ALJ did acknowledge the pertinent diagnostic evidence including mild cervical degenerative changes and advanced lumbar degenerative arthritis, though the ALJ improperly minimized the latter by noting the imaging study was elsewhere characterized as "*only* moderate to severe arthritis located *only* at L4-S1," as if that characterization was relatively benign.  Although there is no reason to believe it was a benign condition, conversely there is no particular reason to believe based on that diagnostic that Plaintiff was as restricted as alleged.  Despite not overtly acknowledging the associated range of motion deficits, the ALJ did limit Plaintiff to occasional postural activities, and Plaintiff does not assert that a greater restriction was warranted, nor does she substantiate such an assertion.

The ALJ further acknowledged the evidence of gait abnormalities and reduced grip strength, as well the countervailing findings on those subjects as summarized above.  Further, the ALJ did limit handling and fingering to frequent and Plaintiff does substantiate that a more restrictive finding was warranted, nor does she challenge the ALJ's finding that her post-surgical nerve condition studies noted only mild bilateral carpal tunnel syndrome. The examination findings were also negative for thenar atrophy, and her symptoms were managed with medication and wrist splints.  Although this evidence could justify a restriction to less than frequent handling and fingering bilaterally (2/3 of an 8-hour day), the evidence does not compel that conclusion.  Where the evidence can reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).

Plaintiff further disputes the ALJ's suggestion that her care was conservative with no surgical procedures after the disability onset.  To be fair, the ALJ's point was not compelling, considering: 1) Plaintiff did indeed have carpal tunnel release surgery a few months prior to the alleged onset date, 2) fibromyalgia is not a condition amenable to surgery, and 3) Plaintiff's cervical and lumbar facet dysfunction was treated with radiofrequency ablation, epidural steroid injections, oral steroids, and opioid based pain killers, treatment measures which the Ninth Circuit has suggested are not appropriately characterized as conservative. *See, e.g. Garrison*, 759 F.3d at 1015 n. 20 ("we doubt that epidural steroid shots to the neck and lower back qualify as 'conservative' medical treatment.")).  The ALJ's reasoning was deficient in these respects, but this reasoning was not necessary to sustain the decision.

Of more importance was Plaintiff's functionality during the period under review.  To that end, the ALJ did assess a fairly restrictive RFC for light exertional work with postural restrictions and limitations on hand handling and fingering, which accounted to some extent for Plaintiff's subjectively and objectively documented pain and deficits in strength and range of motion.  The ALJ stopped short of embracing Plaintiff's allegations as to excruciating pain throughout her body, intolerance for longer than 30 minutes of sitting, standing, or hand use, and inability to lift more than 7 pounds.  In that respect the ALJ's decision was bolstered by Plaintiff's admitted activities of daily living, mixed or normal findings on objective examination, the opinions of the non-examining state agency physicians, and the opinion of the consultative examiner all of whom opined render opinions consistent with the ALJ's RFC for light work.

**B.**      **The Vocational Evidence Regarding Plaintiff's Past Work**

Two hearings were conducted in this case.  First, on February 9, 2021, VE Bakkenson

testified that Plaintiff's past relevant work[4] in child and family community services at Head Start[5] was a hybrid job with overlapping job duties characteristic of two DOT jobs: 1) childcare attendant (DOT 359.677-010) which was a <u>medium</u> exertional job per the DOT, and 2) teacher assistant (DOT 099.327-010), which was a <u>light</u> exertional job per the DOT.  AR 81.

The record becomes a bit murky after this so it is worth stopping and taking stock.  At this point in the proceeding, the possibility of an adverse finding at step four was ruled out.  That is, the record reflected that Plaintiff <u>could not perform her past relevant work</u> because it had characteristics of a medium exertional job (childcare attendant), and a light exertional job (teacher assistant). Of importance, Plaintiff's RFC is for light exertional work.

The best the Court can establish as to what transpired after this can be distilled down to the following: 1) the ALJ continued questioning about the issue of skill transferability to other jobs (a step five consideration) (AR 82);  2) the resultant testimony was a bit disjointed but VE Bakkenson did identify jobs to which Plaintiff's skills would transfer (AR 82-87); 3) the ALJ submitted a vocational interrogatory after the hearing to VE Bakkenson for clarification on the DOT numbers (AR 407); 4) Plaintiff's former counsel objected to the vocational interrogatory and asked for a new hearing (AR 412); 5) at the second hearing VE Ferra classified Plaintiff's past relevant work *not* as a hybrid role, but as a case aid at the <u>light exertional level</u> as generally performed (AR 53); 6) without re-exploring the issue of transferability to inform the step five analysis (ostensibly the basis for the second hearing), the ALJ accepted VE's Ferra's testimony that Plaintiff's past work was actually a case aid as generally performed and that someone with Plaintiff's RFC could perform it; and, 7) the ALJ issued a decision based on a step four finding that Plaintiff could perform her past

[4] Given Plaintiff's RFC is for light work, all agree that Plaintiff could not perform her past relevant work as a winery worker (medium exertional level), nor can she perform her past relevant childcare work (however that work is characterized) as *actually* performed, which was also at the medium exertional level.  The question is whether substantial evidence supported the ALJ's step four finding that she can perform that work as generally performed.
[5] Head Start is federally funded community based childcare program offering full day/full year childcare services for children of income eligible parents. https://fresnoeoc.org/head-start-0-to-5/

work as a case aid as generally performed.

Plaintiff contends the ALJ erred in accepting VE Ferra's testimony that Plaintiff could perform past relevant work as a case aid (light) when VE Bakkenson classified it as a hybrid occupation involving duties of a teaching assistant (light) and childcare attendant (medium). Plaintiff contends VE Ferra did not have an opportunity to review Plaintiff's prior testimony regarding her job duties, nor was VE Ferra aware of VE Bakkenson's classification of the past work. Plaintiff further argues that the DOT description of case aid did not include childcare duties. DOT No. 359.677-010, 1991 WL 672968.

In response, Defendant emphasizes that it was Plaintiff's counsel who: 1) objected to the vocational interrogatory on the grounds that VE Bakkenson's testimony was a "variance from the normal" and would "not be supported by other VE sources," (AR 412); 2) requested a second hearing; and, 3) at that hearing, objected to the ALJ informing VE Ferra of VE Bakkenson's prior responses (AR 52). As such, Defendant contends Plaintiff "can hardly fault the ALJ for following her wishes to hold a second hearing, seek testimony from a different vocational expert, and withhold the prior vocational expert's findings."

Even setting aside the fact that Plaintiff is represented by a new attorney (and even imputing to Plaintiff herself the positions advanced by both attorneys), Plaintiff did not take a position in her letter (AR 412), or at the hearing (AR 53), inconsistent with the position she is advancing now. Plaintiff's letter objecting to the vocational interrogatory had nothing to do with VE Bakkenson's categorization of the past relevant work (PRW) as a hybrid role which included child care attendant duties at the medium exertional level, exertional demands of which exceed her RFC for light work. That was a favorable finding for the Plaintiff, one which would have precluded an adverse step four finding. The first paragraph of letter makes it clear that Plaintiff disputed VE Bakkenson's testimony that Plaintiff acquired transferrable skills in her PRW and requested another hearing on

that issue.  AR 412.

The Court has no occasion to reach the merits of that issue as the ALJ herself never reached the merits of that issue as the analysis did not proceed to step five.  VE Bakkenson's testimony precluded an adverse finding at step four and thus, the analysis would have proceeded to step five but for the additional hearing requested by Plaintiff's counsel at which VE Ferra put step four back into issue by testifying unremarkably that Plaintiff's PRW can be characterized as a case aid, light exertion per DOT 195.367-010, and thereby not precluded by Plaintiff's RFC.  The ALJ accepted that testimony without additional questioning.

As to Defendant's argument that Plaintiff cannot fault the VE for doing as counsel asked and withholding from VE Ferra information about VE Bakkenson's prior categorization of the PRW and jobs to which her skills would transfer (as VE Bakkenson set forth in the hearing and clarified in exhibit 17E, her vocational interrogatory response, which VE Ferra said she did not review), it is worth quoting the relevant testimony before analyzing it:

> Q Ms. Ferra, is the resume in the file a true description of
> your professional qualifications?
> A It is.
> Q Okay. Could you tell me what section of the file did you
> review in preparation for this hearing?
> A I reviewed the E section.
> Q And in CE that I sent out interrogatories to another
> vocational expert, did you review those as well ?
> A I don't recall I didn't -- I didn't download it, I only
> downloaded Exhibit lE and 3E.
> Q Okay. Well, this hearing is really about 17E .
> A Okay. I can log in and go find it, or you can tell me.
> ATTY : Judge, I would just as soon her give her own opinion
> and then refer to 17E if we needed to.
> ALJ : Her own opinion about what though, Mr. Milam? I wanted
> to know if she disagrees [with the] stuff that you brought up in your brief
> requesting this hearing is that this the former VE's testimony
> differs from others so I need to see if her testimony differs with
> respect to the same questions, right?
> ATTY : Yeah. I would just ask her the question, Judge .
> ALJ: There's so much information in here that I would have to
> give her over the phone, it's just easier if she sees the classification of the

18

1    jobs. I mean I can give that to her if you want me to do that but it's just going
2    to take me a long time.
     ATTY : Well, I was just interested in her classification of
3    the job first to see whether it contradicts what the other VE said .
     That will be my preference because it doesn't -- there's no leading
4    of the expert in that sense because she's giving her own opinion
     based on the evidence as compared to what another VE might've said
5    or not said.
     ALJ : But she didn't hear the testimony so now we have to
6    start over with the testimony regarding past work . If I just tell
     her what it was classified as then we have the basis. I don't
7    understand why you're disagreeing with me doing that right now. *I*
     *mean if the position is defined a certain way all we're asking is*
8    *whether or not there would be transferable skills, right?* Essentially.
     ATTY : Basically, at least in part, yeah, that's correct .
9    ALJ : So I don' t see a problem with shortcutting it that way
     because that's the only --
10   ATTY : Well, see --
     ALJ : basis for this issue here, right?
11   ATTY : -- the -- we disagree with -- if that's the only way
     you want to proceed my thought would be that simply if she knows
12   what the past relevant work is without looking up 17E that' s going
     to be more sufficient . If it's the same as it was in the prior
13   folder that confirms it more than just a yes, no to whatever this other
     vocational expert said.
14   ALJ : Okay. I'll give
     ATTY: It could be --
15   ALJ : -- you the past work as it was classified, is that what
     you mean? I mean I don't
16   ATTY : No, I'd just -- I would just ask the VE if she has
     enough evidence to give her testimony about past relevant work .
17   I'd just ask her what it is and then give her the hypo.
     ALJ : Okay. We can just do that, fine.
18   BY ADMINISTRATIVE LAW JUDGE :
     Q Ms. Ferra, can you classify past work that you saw in the
19   file please?
     A The way I classified the past work was winery worker which
20   is DOT 521.685-370, and that is semiskilled at SVP 3 and medium in
     exertion. And the second job I classified case aide, DOT
21   195.367-010 , it is semi-skilled at SVP 3, light according to the Dictionary
     of Occupational Titles, medium as performed according to the record.
22
23   AR 51-53 (emphasis added)
24
25        At this point the ALJ asked if someone with Plaintiff's RFC could perform the work as a
26
27   case aide, and the VE testified affirmatively.  Subsequent questioning was limited to variations on
28

                                              19

the hypothetical and did not explore the issue of skill transferability.

The dispute concerned whether to share with VE Ferra the interrogatory responses of VE Bakkenson as reflected in Exhibit 17E which reflect: 1) VE Bakkenson's classification of Plaintiff's PRW as a hybrid of teaching assistant and childcare attendant; and, 2) VE Bakkenson's conclusion that the PRW yielded transferrable skills which would transfer to other jobs existing in significant numbers in the national economy such as eligibility worker. AR 407.

Counsel thought VE Ferra's responses would have more evidentiary value and legitimacy if she came up with the answers organically/independently without simply being read VE Bakkenson's responses and confirming whether she agrees or disagrees. The ALJ disagreed but ultimately did as counsel requested and simply invited VE Ferra to classify the jobs. On the one hand, given counsel's persistence, it is not unreasonable that the ALJ granted the request.

On the other hand, it was never suggested that the inquiry would simply end there. To the contrary, the preceding discussion suggested that if VE Ferra's responses differed from VE Bakkenson's, VE Ferra would be informed of VE Bakkenson's responses and asked about the discrepancy. But neither counsel nor the ALJ did so.

Moreover, it bears mentioning that exhibit 17E contained both favorable and unfavorable information for the claimant. The favorable information was the classification of the PRW as a hybrid role consisting of childcare attendant at the medium exertional level, thereby precluding an adverse step four finding. The unfavorable information was that the PRW yielded transferable work skills which would transfer to other jobs and would be a potentially predicate for an adverse finding at step five.

Further, the ALJ made a statement which suggested she believed skill transferability was the only item up for reconsideration, not the classification of the PRW:

ALJ : But she didn't hear the testimony so now we have to
start over with the testimony regarding past work . If I just tell

her what it was classified as then we have the basis. I don't understand why you're disagreeing with me doing that right now. *I mean if the position is defined a certain way all we're asking is whether or not there would be transferable skills, right?*

But that is the opposite of what took place.  VE Ferra reclassified the PRW as a case aid at the light exertional level resulting in the adverse finding at step four.  Transferability was never explored.

Additionally, it is worth noting again that VE Ferra stated she had only reviewed exhibits 1E (disability report) and 3E (work history report).  The latter contained check box responses regarding her job's requirements as to lift, carry, sit, stand, postural activities, and related matters. It also contained a brief narrative of her job duties including, "assist(s) teachers and students all day long by observations, writing up reports and a lot of driving for home visits." AR 313–16.  This description did not identify the duties she had previously identified when testifying at the first hearing regarding monitoring students during circle time or snack time, duties which were the predicate for the prior VE Bakkenson's classification of the job in part as a childcare attendant.  AR 85–86.

The ALJ's duty to further develop the record is triggered where the evidence is ambiguous or inadequate to allow for proper evaluation. *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001); *Tonapetyan*, 242 F.3d at 1150.  A specific finding of ambiguity or inadequacy in the record is not required to trigger the necessity to further develop the record where the record itself establishes the ambiguity or inadequacy.  *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011); *Garcia v. Comm'r of Soc. Sec.*, No. 1:19-CV-00545-SAB, 2020 WL 1904826, at *13 (E.D. Cal. Apr. 17, 2020).

Here, the record contained two conflicting responses by the VEs as to the classification of Plaintiff's PRW, and the VEs did not have the same information presented to them in making that determination.  "The ALJ always has a 'special duty to fully and fairly develop the record and to

assure that the claimant's interests are considered.'" *Garcia v. Comm'r of Soc. Sec.*, 768 F.3d 925, 930 (9th Cir. 2014).  This is true notwithstanding the fact that Plaintiff's former counsel neglected to make the inquiry.  Remand is appropriate for the ALJ to obtain testimony from a VE as to the classification of Plaintiff's PRW,  and whether someone with Plaintiff's RFC could perform that PRW, whether that PRW yielded transferable skills to other jobs existing in significant numbers, and to proceed through the sequential process as necessary.  The VE should be fully informed of all information in the record about the nature of the job duties involved in Plaintiff's PRW.

## VI.    Order

For the reasons stated above, the Court finds that substantial evidence and applicable law do not support the ALJ's conclusion that Plaintiff was not disabled.  Accordingly, Plaintiff's appeal from the administrative decision of the Commissioner of Social Security is granted.  The Clerk of Court is directed to enter judgment in favor of Plaintiff Emilia Gallo and against Defendant Kilolo Kijakazi, acting Commissioner of Social Security.


IT IS SO ORDERED.

Dated:   __**March 22, 2023**__                      _____**/s/ Gary S. Austin**_____
                                                         UNITED STATES MAGISTRATE JUDGE